# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TANYA HUGHES,<br><br>　　　Plaintiff,<br><br>　　　　v.<br><br>NOVO NORDISK, INC.,<br><br>　　　Defendant. | Civil Action No. 20-4991 (RK) (DEA)<br><br>**OPINION** |

**KIRSCH, District Judge**

 **THIS MATTER** comes before the Court on Defendant Novo Nordisk, Inc.'s ("Defendant") Motion for Summary Judgment. (ECF No. 43.) Plaintiff Tanya Hughes ("Plaintiff") filed an opposition to the Motion, (ECF No. 47), and Defendant filed a reply, (ECF No. 48). The Court has considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

 This lawsuit concerns Plaintiff's claims of employment discrimination and retaliation against her former employer. Plaintiff, "an African-American" woman, (Compl. ¶ 2, ECF No. 1), worked in a marketing role at Defendant beginning in 2007. According to Plaintiff, she complained to her then-supervisor in early 2016 and early 2017 that she was discriminated against by not receiving the company's 2015 President's Award for her work on a product launch. On October 27, 2017, Plaintiff reported to Defendant's human resources department that she had been discriminated against due to her race and retaliated against for complaining.

Concurrently throughout 2016 and 2017, Plaintiff's supervisors had been speaking to her about her violations of Defendant's policies related to payments made to outside speakers to promote Defendant's products and Plaintiff's use of her corporate credit card. On October 26, 2017—the day before Plaintiff lodged her discrimination complaint—Defendant's Director of Risk and Accountability reported Plaintiff through the company's compliance hotline. This triggered an investigation that resulted in a report sustaining the compliance complaints against Plaintiff on February 12, 2018. On February 28, 2018, Plaintiff was fired for violating company policies. The week before Plaintiff's termination, she applied for a leave of absence from Defendant to care for a sick parent, which was denied shortly after her termination.

On April 23, 2020, Plaintiff filed this lawsuit alleging that her termination violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Compl., ECF No. 1.) Plaintiff brought claims for race discrimination under Section 1981 (Count One), retaliation under Section 1981 (Count Two), interference under the FMLA (Count Three), and retaliation under the FMLA (Count Four). (*Id.* ¶¶ 66–91.) Plaintiff sought damages including, *inter alia*, backpay, compensatory damages, injunctive relief, punitive damages, and attorney's fees. (*Id.* ¶ 93.)

Following the close of discovery, Defendant filed the instant Motion for Summary Judgment on July 14, 2022. (ECF No. 43.)[1] In support, Defendant filed a moving brief, ("Def.'s Br.", ECF No. 43-2), a Statement of Facts, ("Def.'s SOF", ECF No. 43-1), and supporting declarations and exhibits, (ECF Nos. 43-3 to -12). Plaintiff filed a brief in opposition, ("Pl.'s Br.", ECF No. 47), supported by a Counter-Statement of Facts, ("Pl.'s C-SOF", ECF No. 47-1 at *1–

_____

[1] The matter was subsequently transferred to the Undersigned on May 15, 2023. (ECF No. 55.)

7),[2] a Statement of Facts, ("Pl.'s SOF", ECF No. 47-1 at *8–12), and exhibits, (ECF Nos. 47-2 to

-12). Defendant filed a reply brief ("Def.'s Reply Br.", ECF No. 48), a Reply Statement of Facts,

(ECF No. 48-1), and a Counter-Statement of Facts, ("Def.'s C-SOF", ECF No. 48-2).[3]

The Court notes that the parties do not dispute many of the facts underlying their dispute.

In response to Defendant's 197-page Statement of Facts, (*see generally* Def.'s SOF), Plaintiff

comments that "many of those facts merely provid[e] either background information or extraneous

or non-probative facts which are not dispositive," (Pl.'s C-SOF at *1). In line with this comment,

Plaintiff responds to only 49 paragraphs of Defendant's Statement of Facts. (*Id.* at *1–7.)

Therefore, the Court deems the remaining 148 paragraphs as admitted.[4]

## A.    PLAINTIFF'S ROLE AT DEFENDANT

Defendant Novo Nordisk Inc. is a subsidiary of the global healthcare company Novo

Nordisk A/S and is responsible for the sale and marketing of its parent company's pharmaceutical

products in the United States. (Def.'s SOF ¶ 1.) Plaintiff began working at Defendant in 2007 and

joined the company's brand marketing team in October 2008. (*Id.* ¶ 13; Dep. Tr. of Tanya Hughes

("Hughes Dep."), Ex. D to Pl.'s SOF at 92:2–6, ECF No. 47-5.) In January 2017, Plaintiff became

---

[2] Pin-cites preceded by an asterisk refer to the page numbers in the CM/ECF header.

[3] Defendant requests the Court disregard Plaintiff's opposition brief because it was filed late in violation of Local Civil Rule 7.1(d)(5). (Def.'s Reply Br. at 2–3.) Plaintiff's opposition to the Motion was due on August 23, 2022 but was filed at 8:12 a.m. the following day. (ECF No. 47.) The Court finds no prejudice to Defendant from this slight delay of approximately eight hours and will consider Plaintiff's opposition. *See United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000) ("[A] district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment.").

[4] *See* Fed. R. Civ. P. 56(e)(2); Local Civ. R. 56.1(a) (requiring a summary judgment opponent to file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement" and providing that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion"); *see also Muhammad v. Sills Cummis & Gross P.C.*, 621 F. App'x 96, 100 (3d Cir. 2015) (affirming grant of summary judgment where district court treated movant's statement of material facts as undisputed because non-movant failed to respond).

the Associate Director, Value Communication – Obesity Market Access, a role Plaintiff held until her termination. (Def.'s SOF ¶ 14.)

In that role, Plaintiff was responsible for "educat[ing] employers" about one of Defendant's obesity-related pharmaceutical products—Saxenda. (*Id.* ¶ 15.) Defendant's job was to encourage employers to include the product in their benefits plans they provided to their employees, administered by health insurance companies like CVS or United Healthcare, which would then cover reimbursements for Saxenda. (Hughes Dep. at 96:22–97:23.) The more favorably employers viewed Saxenda, the more likely they would be to cover Saxenda in their health insurance plans for their employees, thereby increasing the market for the drug. (*Id.*)

One way Plaintiff educated employers was by organizing "speaker programs," through which Defendant "contracted with key opinion leaders in the healthcare industry to conduct forums to speak on behalf of Novo Nordisk regarding the prevalence and impact of obesity." (Def.'s SOF ¶ 16.) Arranging for speakers was a "highly-regulated process," (*id.*), because "[f]ederal and state law strictly regulates the interactions between healthcare professionals . . . and employees of healthcare companies like Novo Nordisk," (*id.* ¶ 19). Plaintiff acknowledged as much at her deposition, explaining that regulators "didn't want speakers to appear to be overpaid or any type of improper payments to physicians on behalf of a product." (Hughes Dep. at 100:9–24; Def.'s SOF ¶ 20.)

Defendant promulgated a Promotional Speaker Programs Policy (the "Speaker Policy") setting out the company's rules for contracting with speakers. (Def.'s SOF ¶ 18.) The policy required that speakers be paid the fair market value ("FMV") for their service, that any deviation from the set FMV schedules be "approved by the Legal Department," and that the speaker's compensation never deviate from the amount specified in Defendant's agreement with the speaker.

(*Id.* ¶¶ 21–22.) Plaintiff received training on how to determine FMV and comply with the Speaker Policy. (*Id.* ¶¶ 24, 90.)

Plaintiff also had a corporate credit card, which was subject to Defendant's policies governing its employees' use of their corporate cards. (*Id.* ¶ 43.) Defendant's policy prevents employees from "charg[ing] expenses incurred by anyone other than" the cardholding employee without separate approval. (*Id.* ¶ 44.) Further, employees must submit expense reports within 90 days of when the expense was occurred. (*Id.* ¶ 45.) Defendant's expense tracking system automatically generated warnings to a card-holder's supervisor if an employee violated the expense report. (*Id.* ¶ 157.)[5]

Plaintiff had several managers throughout her employment. (Def.'s SOF ¶ 25.) Plaintiff reported to Kim Gwiazdzinski ("Gwiazdzinski") from approximately September 2015 to fall 2016. (Def.'s SOF ¶¶ 25–26; Pl.'s C-SOF ¶¶ 25–26.) In November 2016, Plaintiff began reporting to Michael McCarthy ("McCarthy"). (Def.'s SOF ¶ 27.) Beginning in late February 2017, Plaintiff began reporting to Rich DeNunzio ("DeNunzio"). (*Id.* ¶ 28.) Beginning in June 2017 until her termination in February 2018, Plaintiff reported to Andy Schultz ("Schultz"). (*Id.* ¶ 29.) Gwiazdzinski and Schultz both testified that Plaintiff was the only black employee each directly

---

[5] Although Plaintiff disputes this paragraph of Defendant's Statement of Facts, she offers only a blanket denial that fails to "properly address another party's assertion of fact" by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c), (e). Here and elsewhere where Plaintiff purports to deny a paragraph of Defendant's Statement of Facts but cites no authority for her denial, the Court treats the undisputed assertions as admitted in line with Rule 56 and Local Civil Rule 56.1. *See also Owens v. Am. Hardware Mut. Ins. Co.*, No. 11-6663, 2012 WL 6761818, at *3 (D.N.J. Dec. 31, 2012) ("Without compliance with [Rule 56], the Court is left to sift through often voluminous submissions in search of—sometimes in vain—the undisputed material facts.").

supervised during the relevant period. (Pl.'s SOF ¶ 6; Dep. Tr. of Arthur A. Schultz, III, ("Schultz Dep."), Ex. A to Pl.'s SOF at 9:17–10:9, ECF No. 47-2.)[6]

## B.   EVENTS PRIOR TO OCTOBER 26, 2017

### 1.   Plaintiff's 2015 Performance

Because the parties do not argue that any events from 2015 or earlier are relevant to Plaintiff's claims, the Court begins in 2015. On her 2015 year-end performance review, which was completed by her then-manager Gwiazdzinski, Plaintiff received an "exceeds expectations." (Def.'s SOF ¶¶ 50–52; *see also* Hughes 2015 Performance Review, ECF No. 47-11, 47-12.)

For work she performed in 2015 related to the launch of Saxenda, Plaintiff was eligible to receive Defendant's President's Award (the "Award"), which Plaintiff believed was awarded for "an individual's efforts within the organization towards marketing, driving business or even science." (Def.'s SOF ¶¶ 30–31.) Plaintiff testified that she and approximately thirty other employees were nominated for the Award; however, Plaintiff did not ultimately receive the Award. (*Id.* ¶¶ 31–32, 35–36.) Plaintiff testified to her belief that her name was omitted by another employee—Camille Lee ("Lee")—although Plaintiff also acknowledged that this belief was not based on her personal knowledge. (*Id.* ¶ 36.) Plaintiff and Gwiazdzinski both testified that Gwiazdzinski had no role in the decision whether Plaintiff would receive the Award. (Hughes Dep. at 46:23–47:2 ("Q. So [Gwiazdzinski], to your knowledge, had no input as to who got on the list or who wasn't on the list [for the Award]. Correct? / A. Correct."); Gwiazdzinski Dep. at 18:7–9 ("Q. Did you play any role in . . . awarding [the Award]? / A. No.").) Gwiazdzinski explained that

---

[6] Defendant disputes this fact, citing the portion of Gwiazdzinski's deposition transcript in which she was asked whether she "directly supervise[d] an African-American or black employee" and answered "Not that I recall." (Dep. Tr. of Kim Gwiazdzinski ("Gwiazdzinski Dep."), Ex. C to Pl.'s SOF at 15:15–19, ECF No. 47-4; Def.'s C-SOF.) The Court finds that Gwiazdzinski's response does not create a material fact over whether she supervised a black employee other than Plaintiff.

she began working at Defendant only a few weeks before the Award was given out and therefore was unfamiliar with the selection process. (*Id.* at 16:1–17:24.)

Plaintiff talked to her then-manager Gwiazdzinski about not receiving the Award in at some point in February 2016. (Def.'s SOF ¶ 38; Hughes Dep. at 47:3–7.) Plaintiff testified that she told Gwiazdzinski that she believed her omission from receiving the Award resulted from racial discrimination, to which Gwiazdzinski responded she "would look into it and get back to [Plaintiff]." (*Id.* at 48:2–12). Gwiazdzinski testified that she remembered speaking with Plaintiff about not receiving the Award but did not remember Plaintiff mentioning discrimination. (Def.'s SOF ¶¶ 38–39; Gwiazdzinski Dep. at 21:13–22:4.) Sean Phillips ("Phillips"), who was Gwiazdzinski's manager at the time, (Def.'s SOF ¶ 40), also remembered talking to Plaintiff about the Award and recalled Plaintiff feeling "shortchanged," but Phillips also did not recall her saying she felt discriminated against by not receiving the Award, (Dep. Tr. of Sean Phillips ("Phillips Dep."), Ex. B to Pl.'s SOF at 21:13–22:4, ECF No. 47-3).

At summary judgment, Plaintiff does not dispute that an oversight by Blandine LaCroix ("LaCroix"), the employee who had nominated Plaintiff for the Award, resulted in her failing to receive the Award. (Hughes Dep. at 40:16–22; *see also* Ex. A to Decl. of Blandine LaCroix, ECF No. 43-9; Def.'s SOF ¶ 37.) Plaintiff eventually received a $1,200 bonus and a "recognition award" for her work on the product launch. (*Id.* ¶ 41.) Plaintiff testified that she did not know whether her $1,200 bonus was more or less than the bonuses received by the recipients of the President's Award. (*Id.* ¶¶ 34, 42.)

### 2.    Plaintiff's 2016 Performance

In 2016, Plaintiff received two disciplinary notices for failing to pay her corporate credit card off on time. (Def.'s SOF ¶ 53.) On May 10, 2016, Gwiazdzinski issued Plaintiff a verbal

warning, accompanied by an email notice, that her corporate credit card was more than 90 days past due. (*Id.* ¶¶ 54–55.) On November 9, 2016, Gwiazdzinski issued Plaintiff a written warning that her credit card was again more than 90 days past due. (*Id.* ¶ 56.) The written notice indicated that to avoid disciplinary action, which could include termination, Plaintiff was required to immediately pay the overdue balance. (*Id.*) Schultz testified that expense compliance violations are "terminable" offenses. (Schultz Dep. at 31:23–32:10; Def.'s SOF ¶ 46.)

Plaintiff's 2016 year-end performance review was delivered by Gwiazdzinski in early 2017. (Def.'s SOF ¶ 60.) Plaintiff received an overall evaluation of "approaches expectations" in her 2016 review, which noted a number of areas needing improvement for Plaintiff. (Def.'s SOF ¶¶ 58–61; *see also* "Plaintiff's 2016 Evaluation", Ex. 13 to Hughes Dep., ECF No. 43-5 at *35–52.) McCarthy's comments were more critical than Gwiazdzinski's, describing how Plaintiff had not completed many of her planned projects and "frequently miss[ed] or [was] late to meetings and [did] not actively participat[e]." (Plaintiff's 2016 Evaluation at 6.) McCarthy also noted that Plaintiff "received both a verbal and written warning with respect to completion of expenses and corporate credit card payment violations" and that for one project Plaintiff showed "unwillingness to engage with Legal to try to secure approval of [an] initiative." (*Id.* at 7, 9.)

Plaintiff had the opportunity to respond to the 2016 evaluation, which she did through comments included on the evaluation dated February 28, 2017. In her comments, Plaintiff primarily addressed the performance criticisms in Gwiazdzinski's and McCarthy's comments but concluded by restating her belief that not receiving the President's Award was discriminatory:

> I also made [Gwiazdzinski] aware back in February 2016 that because my name was removed from the Presidents Award for Saxenda I felt discriminated against. I told her I believe this has been a common practice. . . . Nothing else was said about the matter until May 2016 when I received a performance bonus and

>acknowledgement that it was an "oversight" I was not included in
>the President's Award.

(*Id.* at 17–18; *see also* Def.'s SOF ¶¶ 64–65; Pl.'s SOF ¶ 6.) In her testimony given in connection

with this suit, Plaintiff testified that she believed the "approaches expectation" review she received

was retaliatory for raising concerns about not receiving the Award. (Def.'s SOF ¶ 66.)

The parties dispute whether Gwiazdzinski saw Plaintiff's comment about discrimination

regarding the 2015 Award. At her deposition, Gwiazdzinski acknowledged that she had the

opportunity to review Plaintiff's comments to the review, (Gwiazdzinski Dep. at 21:20–22:9), and

agreed that Gwiazdzinski would have had an obligation to report a discrimination complaint to the

human resources department, (*id.* at 19:8–20). However, Gwiazdzinski never spoke to anyone

about Plaintiff's discrimination complaint, because Gwiazdzinski testified that she did not

remember Plaintiff mentioning discrimination in her comments. (*Id.* at 21:20–22:24; Pl.'s SOF

¶¶ 6–7.) Plaintiff does not dispute Gwiazdzinski's testimony that she had not seen Plaintiff's

discrimination comment until preparing for her deposition, years after the review. (Gwiazdzinski

Dep. at 36:17–23; Def.'s SOF ¶¶ 68–69; *see generally* Pl.'s C-SOF.)

The parties also dispute whether DeNunzio saw the "discrimination" comment. DeNunzio

was listed as Plaintiff's manager in her 2016 Review delivered in February 2017, which was the

same month DeNunzio began supervising Plaintiff. (Pl.'s SOF ¶¶ 5, 28; Def.'s C-SOF ¶¶ 5, 28.)

When interviewed later in connection with Defendant's investigation into Plaintiff's

discrimination claim, DeNunzio reportedly "denie[d] reviewing [Plaintiff's 2016 Review] before

our interview and did not know why his name was reflected on it, though suspected that he

approved [] same for its submission into the system as final." ("Marasco Report", Ex. A to Decl.
of Suzanne M. Marasco at 46:955–57, ECF No. 43-10.)[7]

### 3.   Plaintiff's 2017 Performance

On May 11, 2017, Bob Duffield ("Duffield"), in-house counsel at Defendant, emailed
Plaintiff regarding compliance concerns about her planned speaker program. (Def.'s SOF ¶ 87
(citing Ex. 23 to Hughes Dep., ECF No. 43-5 at *60–64).) Duffield raised two concerns: that
Plaintiff did not have speakers sign a promotional speaker contract and did not base the speaker's
compensation on a FMV assessment. (*Id.*) At her deposition, Plaintiff testified that she had a
conversation with Duffield *before* receiving that email in which he told her that a FMV assessment
was not necessary "for employers," *i.e.* for speakers from certain types of companies. (Hughes
Dep. at 164:2–165:14.) Plaintiff agreed that Duffield's verbal statement regarding the FMV
assessment contradicted his subsequent emailed instruction to get a FMV assessment but that
"somewhere along the line in the course of e-mails he change[d] his story." (*Id.* at 165:3–15.)
Duffield's and Plaintiff's email correspondence reflects Duffield and another employee following
up with Plaintiff on the structure of the speaker program several times in May 2017 without
response from Plaintiff. (Ex. 23 to Hughes Dep., ECF No. 43-5 at *60–61.)

The parties focus the Court on Plaintiff's role in determining the rate paid to one particular
speaker, Dr. Terry McInnis. (*Id.* at 158:10–24.) Based on Dr. McInnis's assertion that she was paid
more by other pharmaceutical companies, Plaintiff raised the rate paid to Dr. McInnis without

---

[7] As explained below, *see* Section I.E, *infra*, Defendant hired outside counsel Suzanne Marasco ("Marasco")
in January 2018 to conduct a privileged investigation into Plaintiff's discrimination complaint.

Plaintiff cites this portion of Marasco's report for the proposition that DeNunzio "approved the review and
submitted it into the system as final." (Pl.'s SOF ¶ 5.) However, the Court notes that while DeNunzio agreed
that he likely submitted the review into the system, he did not specifically remember submitting it or agree
that he saw Plaintiff's comment regarding discrimination.

performing a FMV analysis. (*Id.* at 160:15–162:12.) Defendant had policies for approving a speaker's compensation when payment was not made pursuant to the standard FMV methodology, such that a request would need to be approved by Defendant's legal department. (*Id.* at 197:10–22.) Plaintiff testified that she remembered talking to someone in the legal department about developing the FMV but that she never submitted an exception request. (*Id.* 197:25–198:14.)

Shortly after Plaintiff began reporting to Schultz in June 2017, Schultz delivered her mid-year 2017 review. (Def.'s SOF ¶¶ 71–72.) To prepare Plaintiff's review, Schultz relied on comments he received from Plaintiff's colleagues. (*Id.* ¶¶ 74–78.) Based on this feedback, Schultz wrote in Plaintiff's mid-year 2017 review that Plaintiff "can fall off track in terms of connecting with the account/field team and customer follow through and more urgent pull through of those prioritized strategic initiatives." (*Id.* ¶ 79 (quoting Ex. 18 to Hughes Dep., ECF No. 43-5 at *55–59).)

### C.    OCTOBER 2017 REPORTING COMPLIANCE AND DISCRIMINATION REPORTING

On October 26, 2017 at 5:35 p.m., Schultz emailed Plaintiff to follow up on a conversation they had about Plaintiff's expense reporting. (Def.'s SOF ¶¶ 91–94; "Schultz Oct. 26 Email", Ex. 25 to Hughes Dep., ECF No. 43-5 at *66–68.) Schultz wrote that in their earlier conversation he:

> was not questioning the legitimacy of the trip, program, or speaker, but rather calling attention to examples of potential violations of expense reporting policy. As such, I need to connect with the right people internally to understand how to address this as I am unable to approve these as they stand, but you are still floating these expenses. . . . As a reminder, my expectation is that you adhere strictly to all expense reporting policies . . . .

(*Id.*) In his email, Schultz also noted further that Plaintiff had improperly charged other employees' hotel room expenses and a speaker's flight expense to her credit card. (*Id.*) At her deposition,

Plaintiff testified that since Schultz began supervising Plaintiff in June of 2017, he had been raising questions about her expenses. (Hughes Dep. at 257:14–258:8.)

Shortly after emailing Plaintiff, Schultz forwarded his email to Amy Foshee, who worked in the human resources department, requesting "feedback on all the coaching provided [to Plaintiff] and perspective on next steps moving forward." (Schultz Oct. 26 Email.) Schultz also forwarded the email to DeNunzio, who replied: "Thank you for sharing . . . pretty clear / I really am unfamiliar with expense violations and action steps needed . . . hopefully easy solution from compliance. If any grounds for dismissal allowed, let me know as we might need to push I'm guessing." (*Id.*) [8]

Also on October 26, 2017, Dan Spicehandler ("Spicehandler"), Defendant's Director of Risk and Accountability, called the company's "compliance hotline" about Plaintiff. (Def.'s SOF ¶¶ 88–90.) Spicehandler reported that Plaintiff was planning speaker programs that "did not appear to follow process for contracts, FMV, approval process or needs assessment documentation." (Ex. 24 to Hughes Dep., ECF No. 43-5 at *65.) Spicehandler stated that Plaintiff had been made aware of the Speaker Policy but "disregarded the policy requirements and advice provided by Legal and Compliance." (Def.'s SOF ¶ 90 (quoting "Vecchi Report", Ex. A to Decl. of Amanda Greenfield, ECF No. 43-12 at 1).)

On October 27, 2017—the following day—Plaintiff called Defendant's human resources department to report that she had experienced racial discrimination. (*Id.* ¶ 130 (quoting "Discrimination Intake Report", Ex. A to Decl. of Amy Foshee at 1, ECF No. 43-8).) Foshee

---

[8] DeNunzio does not appear to have been deposed for this matter. (*See* Def.'s Reply Br. at 7 ("Plaintiff had the opportunity to depose DeNunzio in this matter, but, for whatever reason, chose not to do so.").) The parties' evidence offers no further context for DeNunzio's statement.

conducted the intake interview and recorded Plaintiff's complaints in a three-page document. (*Id.*

¶ 131.) Foshee summarized Plaintiff's complaints in the following paragraph:

> [Plaintiff] called to report that she feels she has been discriminated
> against due to her race. She stated that she has reported her concerns
> previously but it wasn't taken seriously. [Plaintiff] stated that she is
> calling now because she feels that her presence in her department is
> overlooked and she doesn't get recognized. [Plaintiff] stated that her
> current manager, [Schultz], has spent very little time with her and
> engages with everyone else on the team but not her. [Plaintiff] said
> she is getting questioned about everything on her expense report and
> she thinks [Schultz] has talked to [Gwiazdzinski], her past manager
> and is looking for something she has done incorrectly. Recently he
> has pointed out various issues with expense reports and [Schultz]
> has called it "suspicious."

(Discrimination Intake Report at 1.) The conduct Plaintiff complained about related both to her

time supervised by Gwiazdzinski as well as later by Schultz, her then-current supervisor.

Relating to Gwiazdzinski, Plaintiff stated that she believed she had not received the 2015

Award because Lee had removed her name from the list of finalists. (*Id.* at 1.) Plaintiff reported

that she also complained to Gwiazdzinski about being discriminated against as "the only African

American female in the marketing department." (*Id.*) Plaintiff stated that Gwiazdzinski never

followed up on Plaintiff's complaint about discrimination relating to the Award. (*Id.* at 3.) Plaintiff

also believed that her relationship with Gwiazdzinski went "downhill" afterwards because

Gwiazdzinski began giving Plaintiff more work and was not satisfied with Plaintiff's performance.

(*Id.* at 2–3.) Plaintiff said that Gwiazdzinski had threatened and issued Plaintiff warnings for late

expense reports despite the fact that Gwiazdzinski was not required to. (*Id.* at 2.)

Relating to Schultz, Plaintiff reported that he "overlooked" her presence in the department,

failed to recognize her work, and spent less time on Plaintiff compared to her colleagues. (*Id.* at

3.) Plaintiff also complained more generally that the team she worked with did not like her, that

they "complained that she wasn't collaborating but they were colluding behind her back," and that

they "didn't like that she was working beyond them doing most of the work." (*Id.* at 2.) Schultz told Plaintiff that several items on her expense report were "suspicious," which Plaintiff believed meant Schultz talked to Gwiazdzinski about Plaintiff's expense reports. (*Id.* at 3.)[9] Asked at her deposition, Plaintiff admitted that she had no personal knowledge of Schultz and Gwiazdzinski ever speaking about her expense reports. (Def.'s SOF ¶ 134.) Schultz denied ever speaking with Gwiazdzinski about them. (*Id.* ¶ 135.)

### D.   INVESTIGATION OF COMPLIANCE ISSUES AND PLAINTIFF'S TERMINATION

#### 1.   Vecchi's Investigation

Spicehandler's report to the compliance hotline triggered an investigation by Anna Vecchi ("Vecchi"), the Senior Manager of Investigations in the compliance department. (*Id.* ¶ 96.) Vecchi interviewed eleven witnesses, including Plaintiff, Duffield, and Schultz. (*Id.* ¶ 98.) Vecchi also reviewed documents, including contracts related to the speaker programs and Plaintiff's emails for a five-month period in 2017. (*Id.* ¶ 99.)

Vecchi issued a report on February 9, 2018 that substantiated the allegations against Plaintiff. (*Id.* ¶ 100; *see also* Vecchi Report at 1.) Regarding the speaker program, Vecchi concluded that Plaintiff had "made a decision to increase a [] speaker's fee [by $1,000 per engagement] for 2017, at the speaker's request" without "a proper FMV assessment or exception request." (*Id.* ¶ 101 (quoting Vecchi Report at 1).) At her deposition, Plaintiff agreed that increasing the speaker fee by $1,000 without conducting a FMV assessment violated the Speaker Policy. (*Id.* ¶ 103.) Vecchi also found that in running the speaker program, Plaintiff used an improper computer system and outdated program structure, both of which violated Defendant's

---

[9] Plaintiff made additional complaints to the human resources department on November 9 and 30, 2017 because she felt like her discrimination complaints were not being acted upon. (Def.'s SOF ¶¶ 144–45.)

relevant policies. (*Id.* ¶¶ 104, 107.) Vecchi concluded her findings regarding the speaker program by writing, "[w]hile the evidence shows [Plaintiff] did take certain steps to comply with policy requirements, . . . [Plaintiff] should have exercised better professional judgment and sought clarification to ensure compliance with all relevant policy requirements." (*Id.* ¶ 108 (quoting Vecchi Report at 3).)

Vecchi also examined allegations regarding Plaintiff's expense reporting. Vecchi concluded that Plaintiff "expensed an employer speaker's airfare and hotel for the April 2017 program" on her corporate credit card in violation of Defendant's policies. (*Id.* ¶ 105 (quoting Vecchi Report at 2).) Vecchi also found that Plaintiff failed to "timely submit the employer speaker's travel expenses for reimbursement." (*Id.* ¶ 106 (quoting Vecchi Report at 2–3).)

### 2.    Plaintiff's Termination

On February 12, 2018, Vecchi emailed Schultz and two human resources employees a summary of her report's findings. (Def.'s SOF ¶ 109; *see also* "Ryan Feb. 2018 Email Chain", Ex. F to Decl. of Arthur A. Schultz, III, ECF No. 43-7 at *22–26.) Vecchi noted that she had met with Kevin Ryan ("Ryan"), Defendant's Senior Director of Risk & Accountability in the Ethics & Compliance Department, about the report and that he recommended giving Plaintiff a written warning. (*Id.* ¶ 110.)

On February 21, 2018, Ryan, Vecchi, Schultz, DeNunzio, and Lyn Challis ("Challis," a vice president in the human resources department) met to discuss the appropriate discipline for Plaintiff. (*Id.* ¶ 112; Pl.'s SOF ¶ 13; Dep. Tr. of Kevin Ryan ("Ryan Dep.") at 28:4–19, ECF No. 47-6).) Ryan testified that at the meeting, he remembered learning from Challis that Plaintiff's performance reviews for the past several years "showed her not taking direction," and also that there were issues "from legal" that gave Ryan "concern," such as Plaintiff not taking advice from

15

the legal department. (*Id.* at 35:25–36:22.) Ryan recalled being told about Plaintiff's performance reviews for a few of the preceding years and that the reviews reflected that these issues were "a recurring theme." (*Id.* at 36:23–37:11.) Ryan concluded that "someone at [Plaintiff's] position should have been aware of these policies, had received guidance from the legal department[,] and chose not to follow it." (*Id.* at 38:10–21.) Ryan did not recall anyone at the meeting mentioning that Plaintiff had recently filed a discrimination complaint. (*Id.* at 41:14–22.) Schultz, who was also at the meeting, remembered discussing "additional compliance violations that were not included in the original compliance investigation," and that these additional violations are what "warranted a change in decision." (Schultz Dep. at 54:4–13.) However, Schultz did not recall exactly when or how the decision was made. (*Id.* at 54:14–55:11.)

The morning after the meeting—on February 22, 2018—Ryan emailed DeNunzio and Schultz, copying several other employees, revising his recommended discipline. (*Id.* ¶ 119; Ryan Feb. 2018 Email Chain at *24–25.) Ryan wrote in relevant part:

> As you know from [Vecchi's] previous email, [Vecchi] substantiated numerous violations of Company policy by [Plaintiff]. At the meeting yesterday we further discussed some of [Plaintiff's] behaviors that were not part of the compliance investigation but that present additional risk to the Company. [Plaintiff] has not demonstrated the ability or willingness to apply guidance received from legal and/or line management to ensure she is doing her job in a compliant manner going forward. There also is a pattern of failing to take accountability on [Plaintiff's] part that is cause for concern. She has had reoccurring issues with expense reporting (including credit card delinquencies) and speaker programs that cannot be explained by a lack of understanding of policies. I believe [Plaintiff's] lack of collaboration and poor judgment in knowing when to seek guidance on policies makes it likely that she will have further compliance infractions. For all of these reasons, I am revising my previous recommendation for a written warning to termination of [Plaintiff's] employment.

(*Id.*) Schultz and DeNunzio replied to the email that they agreed with the recommendation. (*Id.*) Plaintiff's employment was terminated on February 28, 2018. (Def.'s SOF ¶¶ 124–26.)[10]

Ryan alone made the recommendation, based on the findings of Vecchi's investigation, for Plaintiff's discipline, which Plaintiff does not dispute. (*Id.* ¶ 118; Schultz Dep. at 50:10–16.) It is also undisputed that at the time Ryan made his recommendation, he was unaware of Plaintiff's race, unaware that Plaintiff had ever raised concerns about race discrimination, and unaware that Plaintiff had applied for FMLA leave. (Def.'s SOF ¶¶ 120–23.) Regarding his initial recommendation to issue Plaintiff a written warning rather than fire her, Ryan declared that he was not aware of any other employee to have violated Defendant's policies in a way similar to Plaintiff so he lacked precedent for calibrating the appropriate discipline. (*Id.* ¶ 111.)

### 3.   Plaintiff's Replacement

On February 25, 2018—after the decision to terminate Plaintiff had been made but before Plaintiff had been fired—DeNunzio emailed Schultz to propose filling Plaintiff's role at the company with a person named "Andrew." (Def.'s C-SOF ¶ 19.) Instead, Plaintiff's role at the company was initially taken over by Schultz and an employee named Tony McDermott ("McDermott"), before a fourth employee, Brian Lerner ("Lerner"), permanently filled Plaintiff's

---

[10] The parties dispute whether at the time Plaintiff was fired, Plaintiff was "on the verge of being transferred for an assistant director position under other management" as Plaintiff contends. (Pl.'s SOF ¶ 18.) In support of this assertion, Plaintiff only points to an email among employees at Defendant from February 23, 2018. Susan Harris wrote to Lara Daum:

> . . . I'm trying to get a final interview between [Plaintiff] and [LaCroix] scheduled. . . . [LaCroix] is aware of progress with [Plaintiff] and is aligned but wants to meet with her for 20 minutes. Is there anything else I can do to get it scheduled?

(Ex. G to Pl.'s SOF, ECF No. 47-8.) Schultz was unfamiliar with the email and unable to give context for the email when asked about it at his deposition. (Schultz. Dep. at 88:14–19.)

position. (*Id.* ¶ 20.) Schultz, "Andrew," McDermott, and Lerner were all white men. (Schultz. Dep. at 93:20–95:9.)

### E.   PLAINTIFF'S DISCRIMINATION COMPLAINTS

In response to Plaintiff's October 27, 2017 complaint of discrimination and retaliation, Defendant hired outside counsel Suzanne Marasco ("Marasco") to conduct a privileged investigation of same on January 25, 2018. (Def.'s SOF ¶ 147; Decl. of Suzanne M. Marasco ("Marasco Decl.") ¶ 2, ECF No. 43-10.) During an approximately three-month period from January to April 2018, (*Id.* ¶ 4), Marasco interviewed nine witnesses, including Plaintiff, Schultz, LaCroix, DeNunzio, and Gwiazdzinski, (Marasco Report at 1:18–2:30).

In Marasco's 74-page final report, dated April 25, 2018, Marasco was unable to sustain Plaintiff's allegations of discrimination or retaliation. (*Id.* at 72:1502–04.) Marasco found that Plaintiff's claim of discrimination related to her non-receipt of the President's Award was unsupported because (1) "the same managers who allegedly disapproved the award . . . approved her positive year end rating," (2) "the President's Award was discretionary and was not given to all employees," and (3) the omission was later rectified. (*Id.* at 72:1504–73:1513.) Marasco noted that despite her claim of discrimination, Plaintiff "did not suffer adverse employment action as she received favorable reviews and survived various reorganizations." (*Id.* at 73:1514–17.) With respect to Plaintiff's claim of retaliation, Marasco concluded:

> [M]any of the concerns about [Plaintiff's] performance were independently and objectively supported by examples of behavior which [Plaintiff] acknowledged. I could find no connection between her managers' evaluations, ratings and criticisms to the complaint of discrimination in 2016.

(*Id.* at 73:1521–26.) Further, a vice president in human resources at Defendant explained to Marasco that Plaintiff's supervisors' reviews could "change each year depending on the manager,

as well as the expectations and goals which may change and are set from year to year." (*Id.* at

73:1530–32.) Marasco concluded by summarizing:

> It is undisputed that [Plaintiff] had various issues complying with
> expense reporting requirements and attending meetings, which lead
> [sic] to valid criticisms about her employment. While [Plaintiff]
> minimized the significance of her expense violations and
> performance deficiencies, this attitude made it very difficult for
> [Gwiazdzinski] and [Schultz] to coach [Plaintiff] to correct these
> behaviors.

(*Id.* at 74:1536–40.) However, Marasco's report recounts a portion of her interview with LaCroix,

who supervised Plaintiff for several years until 2013. (Pl.'s SOF ¶¶ 3–4; Marasco Report at

39:825–26.) Marasco reported that LaCroix told her:

> Though there were no specific instances of discrimination which
> [LaCroix] could point to, she did corroborate [Plaintiff's] claim that
> [Plaintiff] was treated differently or unfairly as compared to others.
> She relates that [Plaintiff] was the only African American in Market
> Access, and that the rules which applied to [Plaintiff] did not apply
> to others. However, [LaCroix] cannot affirm that the unfair
> treatment which [Plaintiff] received was based upon her race.

(*Id.* at 41:850–56.) LaCroix also told Marasco that Plaintiff "never specifically stated that she felt

she was being treated differently or unfairly because of her race (or gender)." (*Id.* at 42:868–69.)

LaCroix did believe that "Phillips treated [Plaintiff] differently due to her race (as he treated

anyone not like him differently) . . . ." (*Id.* at 42:871–72.)

During her deposition, Plaintiff testified that another employee of the company, Susan

Harris ("Harris"), was involved in an investigation relating to Harris's alleged violations of the

speaker program policies. (Def.'s SOF ¶ 127.) Plaintiff alleged that Harris, who is white, was not

fired as a result of the investigation into her conduct related to the speaker programs. (*Id.* ¶ 128.)

Plaintiff lacks personal knowledge about the investigation of Harris and whether any actual

violation of Defendant's policy was found. (*Id.* ¶ 129.) Plaintiff also cites Phillip's deposition in

support of her contention that "other Novo Nordisk employees made late payments on their corporate credit card . . . without receiving a written warning." (Pl.'s C-SOF ¶¶ 53–57.) At his deposition, Phillips admitted that he had problems making "timely submissions" given his "extensive travel" and that he would receive "general nudging" about submitting them. (Pl.'s SOF ¶ 2; Phillips Dep. at 24:11–25.)

### F.   PLAINTIFF'S REQUEST FOR FMLA LEAVE [11]

On February 20, 2018, Plaintiff applied to Liberty Mutual, Defendant's third-party medical leave administrator, for FMLA leave. (Def.'s SOF ¶¶ 166–67.) Plaintiff requested a one-year leave beginning the day of her request. (*Id.*) Plaintiff had missed twelve days of work in February 2018 to care for her mother. (*Id.* ¶ 165.) Schultz, Plaintiff's then-manager, provided Plaintiff with information about requesting and taking FMLA leave and encouraged her to take time off if she needed it. (*Id.*) Liberty Mutual notified Schultz on February 22, 2018 that Plaintiff had applied for FMLA leave. (*Id.* ¶ 170.) On March 1, 2018—the day after Plaintiff was fired—Liberty Mutual denied Plaintiff's FMLA request because she was not actively employed at Defendant. (*Id.* ¶ 173.) At her deposition, Plaintiff could not "say definitively who" interfered with her FMLA rights but that Defendant generally did so. (*Id.* ¶ 177.)

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v.*

---

[11] The Court briefly recounts the parties' evidence with respect to Plaintiff's FMLA claims only to the extent necessary to establish Defendant's *prima facie* case regarding the claim, given Plaintiff's evident abandonment of the claim, *see* Section III.B, *infra*.

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant meets this threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts").

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at 255). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v.*

*Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997) (quoting *Robinson v. PPG Indus. Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994)).

## III.    DISCUSSION

Defendant moves for summary judgment on all four counts of the Complaint. Defendant argues that Plaintiff has adduced no evidence that could make out a *prima facie* case of either race discrimination or retaliation under Section 1981. Defendant contends that in any event, it has offered nondiscriminatory and non-retaliatory reasons for Plaintiff's termination that make summary judgment appropriate. Defendant also seeks summary judgment on Plaintiff's FMLA claims, which Plaintiff does not oppose. The Court will address each claim in turn.[12]

### A.    PLAINTIFF'S SECTION 1981 CLAIMS

In Counts One and Two, Plaintiff brings two Section 1981 claims: one claim for employment discrimination based on her race and one claim for retaliation. (Compl. ¶¶ 66–76.) Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens . . .

42 U.S.C. § 1981(a). In the absence of direct evidence, Section 1981 employment race discrimination and retaliation claims are analyzed under the three-step burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010) (employment discrimination claim); *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (retaliation claim). At Step One, a plaintiff

---

[12] In the event the Court does not dismiss all of Plaintiff's claims, Defendant also seeks the Court to limit Plaintiff's potential damages due to her performance-based termination from Ferring Pharmaceuticals after she was fired from Defendant, which Plaintiff opposes. (Def.'s Br. at 27–29; Pl.'s Br. at 11.) Because the Court grants summary judgment on all of Plaintiff's claims, it need not reach this argument.

must make out the initial burden of establishing a *prima facie* case of the elements for her claim of unlawful discrimination or retaliation. *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff makes this *prima facie* showing, at Step Two, the burden of production "'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 803). "The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 254, 256 (1981)). The employer's responsibility to make a showing on this second prong is a "relatively light burden." *Id.*

If the employer meets its Step Two burden, at Step Three, the burden shifts back to the plaintiff to establish "that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken." *Castleberry*, 863 F.3d at 263 (citing *McDonnell Douglas*, 411 U.S. at 804). A plaintiff may generally demonstrate pretext by offering rebuttal evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).

The Court finds that Plaintiff has not established a *prima facie* case of employment discrimination under Section 1981, and that even if she had, Defendant has offered a nondiscriminatory reason for her termination that Plaintiff has not rebutted. On Plaintiff's retaliation claim, the Court finds that a Section 1981 retaliation claim cannot stand without a viable

discrimination claim, but that even under the *McDonnell Douglas* framework, the Court would grant summary judgment to Defendant on the retaliation claim as well.

      **1.**      **Whether Allegations Related to the President's Award are Time-Barred**

Before turning to the *McDonnell Douglas* test, the Court addresses Defendant's argument that Plaintiff's claims premised on her failure to receive the President's Award are time-barred. Defendant argues that Plaintiff was removed from the list of nominees for the Award and first complained about her removal in or before February 2016. (Def.'s Br. at 15.) Section 1981's statute of limitations is four years, Plaintiff's suit was filed in April 2020, and therefore, Defendant concludes, Plaintiff cannot rely on conduct related to the Award in support of her Section 1981 claims. (*Id.* at 15–16.) Plaintiff does not address Defendant's statute of limitations argument in her opposition. (*See generally* Pl.'s Br.)

Defendant is correct that a four-year statute of limitations applies for Section 1981 claims. *See McGovern v. City of Philadelphia*, 554 F.3d 114, 116 (3d Cir. 2009) (citing *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004) and 28 U.S.C. § 1658(a)). Defendant is also correct that a discriminatory act that falls outside the limitations period cannot be an adverse employment action on which a Section 1981 claim is based. *See Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 (3d Cir. 2005). As the Supreme Court explained, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). However, "[t]he existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id.* In that scenario, the plaintiff could "us[e] the prior acts as background evidence in support of a timely claim." *Id.*

Here, the Court will not disregard the facts related to the President's Award in considering Plaintiff's Section 1981 claims. The decision to not give Plaintiff the 2015 Award was made in early 2016, (Def.'s SOF ¶ 33), and Plaintiff may therefore not rely on her non-receipt of the Award as an adverse employment action because she filed suit over four years later in April 2020, (Complaint, ECF No. 1). However, Plaintiff's discrimination and retaliation claims rely on her non-receipt of the Award as "background evidence" supporting her claim based on her February 2018 termination, *Morgan*, 536 U.S. at 113, which was within the limitations period. Therefore, the Court will consider these facts. *See also Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997) (holding that "any discrimination claim based on [the plaintiff's] tenure denial is time-barred" but "the events surrounding that denial are [] relevant evidence which [the plaintiff] could use at trial" (citation omitted)).

### 2.    Plaintiff's Race Discrimination Claims

#### a.    Step One: Plaintiff's *Prima Facie* Burden

To establish a *prima facie* claim for race discrimination under Section 1981, a plaintiff must show that: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 89 (3d Cir. 2015) (citations omitted). To meet her burden at Step One, a plaintiff need only overcome a "low bar." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)). Defendant only argues the fourth element, (Def.'s Br. at 18–20), and therefore concedes that the first three elements are met.

Establishing the disputed fourth element requires Plaintiff to show a causal connection between her protected status (her race) and the adverse employment action (her termination). As the Supreme Court articulated recently, to prevail on a Section 1981 race discrimination claim, a plaintiff must "prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020); *Robinson v. Giant Eagle*, No. 23-1804, 2024 WL 747237, at *1 (3d Cir. Feb. 23, 2024) (affirming district court's grant of summary judgment to defendant on Section 1981 employment discrimination case and noting that plaintiff must demonstrate that race was a but-for cause rather than merely a "motivating factor" in his firing). The Court examines the whole of plaintiff's evidence of causation "with a careful eye to the specific facts and circumstances of a particular case" without looking "to any particular mode of proof." *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 232 (D.N.J. 2014) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 277 (3d Cir. 2000) and *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997)).

In her opposition brief, Plaintiff contends that Defendant "acted with extreme prejudice due to her race." (Pl.'s Br. at 8.) Plaintiff's precise theory for making out a *prima facie* case is unclear because she generally lists evidence that supports either that her termination was motivated by "race or in retaliation for her opposition to discrimination" without distinguishing which evidence supports which theory. (*Id.* at 9.) The Court discerns several race-based arguments Plaintiff makes. *First,* as raised in Plaintiff's October 27, 2017 complaint to human resources, Plaintiff stated that Gwiazdzinski and Schultz treated her differently based on her race. (*Id.* at 10.) *Second*, Plaintiff complained in February 2016 and 2017 about not receiving the 2015 President's Award, and Gwiazdzinski and DeNunzio did not follow up on Plaintiff's complaint. (*Id.*; Pl.'s SOF ¶¶ 5–7.) *Third*, white employees allegedly violated Defendant's policies but were not fired. (*Id.* ¶

2.) *Fourth*, LaCroix told Marasco that she believed Plaintiff was treated differently from other employees. (*Id.* ¶¶ 3–4.) *Fifth*, Plaintiff was replaced with a white man following her termination. (*Id.* ¶¶ 19–20; Pl.'s Br. at 10.)

Even viewing the record in the light most favorable to Plaintiff and accounting for the low bar required to make out a *prima facie* case of race discrimination, the Court finds that Plaintiff has failed to adduce sufficient evidence to meet her burden.

Plaintiff generally alleges that her supervisors treated her differently from her colleagues. In her October 27, 2017 complaint, Plaintiff reported she "feels that her presence in her department is overlooked and she doesn't get recognized," that Schultz "has spent very little time with her and engages with everyone else on the team but not her," and that Schultz was "question[ing] [Plaintiff] about everything on her expense report" and "looking for something she has done incorrectly." (Discrimination Intake Report at 3.) At her deposition, Plaintiff testified that "over the years" working at Defendant, she was "overlooked for either promotions" and "omitted from meetings or just not invited consistently." (Hughes Dep. at 138:2–13.)

However, Plaintiff offers nothing beyond these general statements to support her contention that Schultz actually treated her differently or, if so, that he did so motivated by discriminatory animus. "[A]n inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Johnson v. Multi– Solutions, Inc.,* 493 F. App'x 289, 292 (3d Cir. June 28, 2012) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)). In *Gross v. R.T. Reynolds, Inc.*, the Third Circuit found that a complaint failed to adequately allege an employment discrimination under Section 1981 because it merely "state[d], in conclusory fashion, that the reason for [the defendants' actions] is that [defendants] harbored discriminatory animus . . . ." 487 F. App'x 711, 716 (3d Cir.

2012). The plaintiff's allegations that the defendant's employees had "sabotaged his work schedule by showing favoritism and granting preferences to other non-minority contractors," *id.* at 715 (quotation marks omitted), were inadequate without allegations of "how delays in the construction project were motivated by or related to [the plaintiff's] race," *id.* at 717. The court concluded that "[w]hile the [complaint] alleges an abundance of wrongdoing by [the defendants], it fails to allege any facts supporting the conclusion that those acts were motivated by discrimination on the basis of race." *Id.* at 716.

Plaintiff's evidence to meet her *prima facie* burden is even weaker here. While Plaintiff alleged that Schultz spent less time with Plaintiff, did not invite her to meetings, and disproportionately scrutinized her expense reports, Plaintiff has neither adduced any evidence supporting these allegations nor provided any specifics regarding Schultz's alleged conduct. Plaintiff offers no evidence substantiating that she was in fact excluded from meetings or received less attention from Schultz. Plaintiff could not remember the number of meetings she was purportedly excluded from or when they occurred. (Def.'s SOF ¶ 143.) Plaintiff also offers no evidence that Schultz and Gwiazdzinski spoke about her expense reports or that Schultz examined Plaintiff's credit card expenses as a result. (*Id.* ¶¶ 134–35.)

Even if Plaintiff had adduced evidence supporting that she was treated differently, there is no basis to connect Plaintiff's treatment to her race. True, Plaintiff was the only African American employee either Gwiazdzinski or Schultz supervised. (Gwiazdzinski Dep. at 15:15–19; Schultz Dep. at 9:17–10:9.) However, to make out a *prima facie* case, "[i]t is not enough simply to recite workplace grievances and state the ethnic backgrounds of the participants." *Skoorka v. Kean Univ.*, No. 16-3842, 2018 WL 3122331, at *12 (D.N.J. June 26, 2018). Broad claims that Plaintiff was treated differently by her supervisors, unsupported from any specific details of how her supervisors

28

treated her colleagues or why Plaintiff believes her supervisors acted based on race, cannot create an inference of race discrimination. Indeed, Plaintiff even denied that Schultz "treated [her] different[ly] because [she is] black." (Hughes Dep. at 302:21–25.) Gwiazdzinski's alleged conduct is even further removed from the employment action Plaintiff challenges—her February 2018 termination—because Gwiazdzinski left the company over a year before Plaintiff was terminated. (Def.'s SOF ¶¶ 25–26; Pl.'s C-SOF ¶¶ 25–26.) Like the plaintiff in *Gross v. R.T. Reynolds, Inc.*, Plaintiff has failed to offer "any facts supporting the conclusion that [Defendant's] acts were motivated by discrimination on the basis of race." 487 F. App'x at 716.

Plaintiff's evidence related to the 2015 President's Award suffers similar flaws. Plaintiff has not offered evidence that she was treated differently based on race for not receiving the Award. In fact, Plaintiff agrees that she did not receive the Award because of a mistake by LaCroix, the employee who originally nominated Plaintiff for the Award. (Def.'s SOF ¶ 37; Hughes Dep. at 40:16–22.) Once LaCroix realized her mistake, Plaintiff received a recognition award and a $1,200 bonus, which Plaintiff did not know whether was more or less than the bonuses received by the Award recipients. (Def.'s SOF ¶ 34, 41–42.) Plaintiff offers no evidence that any employee present at the February 2018 meeting—after which Ryan recommended terminating Plaintiff's employment—was involved in deciding whether Plaintiff would receive the 2015 Award. Therefore, Plaintiff fails to connect not receiving the Award or complaining about same to racial animus or her eventual termination two years later.

Plaintiff's reliance on Defendant's treatment of employees with misconduct allegedly similar to Plaintiff's also fails to permit an inference of race discrimination. Plaintiff may meet her *prima facie* burden through evidence of non-African American, similarly-situated employees who "were treated more favorably under similar circumstances" to Plaintiff. *Greene v. Virgin Islands*

*Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n.7 (3d Cir. 2003)). Whether employees are similarly situated turns on "factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher,* 441 F. App'x at 882 (citations omitted); *see also Oakley v. Orthopaedic Assocs. of Allentown, Ltd.*, 742 F. Supp. 2d 601, 608–09 (E.D. Pa. 2010) ("[E]mployees are similarly situated when their conduct on the job-or misconduct-is similar in nature."). Plaintiff argues that "other Novo Nordisk employees made late payments on their corporate credit card . . . without receiving a written warning." (Pl.'s C-SOF ¶ 46.) Plaintiff points to Phillips, a white male Vice President of Manage Markets, who testified that he had problems making "timely submissions" given his "extensive travel" and that he received "general nudging" about submitting them. (Phillips Dep. at 24:11–25.) Plaintiff also asserted that Harris, a white employee, was investigated for alleged violations of the speaker program policies without being terminated. (Def.'s SOF ¶ 127.)

Viewed most favorably to Plaintiff, Plaintiff's evidence about Phillips and Harris does not give rise to an inference that Plaintiff was treated differently to other similarly-situated employees. Plaintiff has adduced no evidence showing that Phillips is similarly situated beyond his single statement that he occasionally made late credit card submissions. Plaintiff offers no evidence about the nature of Phillips's violations of Defendant's policies—such as how often he filed his expenses late, whether he resisted complying after numerous warnings, whether he violated policies related to paying speakers—that could suggest he was similarly situated to Plaintiff. In short, Plaintiff has adduced no evidence that Phillips's violations were as pervasive and multi-fronted as Plaintiff's.

Harris likewise cannot stand as a comparator for Plaintiff because Plaintiff admitted at her deposition that she lacked personal knowledge about whether Defendant actually investigated

Harris or sustained any violation of Defendant's policy. (Def.'s SOF ¶ 129.) Thus, although cognizant that a "similarly situated employee does not need to be identically situated," *Douglas v. Ctr. for Comprehensive Care/Jersey City Med. Ctr.*, No. 16-9146, 2019 WL 1379880, at *5 n.8 (D.N.J. Mar. 26, 2019) (citation omitted), the Court finds that the evidence Plaintiff offers regarding Phillips and Harris is insufficient to support an inference that Plaintiff's termination is tied to her race. *See also Robinson*, 2024 WL 747237, at *2 (rejecting plaintiffs' reliance on comparators because "the employees in the examples [plaintiffs] cite are simply not similarly situated").

LaCroix's statement, relayed through Marasco's report, that LaCroix believed Plaintiff was treated differently from her colleagues, (Pl.'s SOF ¶¶ 3–4), does not evidence discrimination. Marasco wrote that LaCroix "corroborate[d] Tanya's claim that Tanya was treated differently or unfairly as compared to others." (Marasco Report at 41:852–53; *see also id.* at 41:854.) LaCroix also told Marasco that Phillips "had issues dealing with . . . anyone who was not like himself," (*id.* at 40:832–34), and that she believed that Phillips "treated Tanya differently due to her race," (*id.* at 42:871–72).

One witness's statement that Plaintiff was treated differently cannot support an inference that Plaintiff was treated differently from similarly-situated colleagues based on her race. *See Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 241 (D.N.J. 2015) ("[A]lthough Plaintiff and [another individual] both opined that Plaintiff received more difficult assignments because she was Black . . . there are no facts in the record to suggest that this was more than mere conjecture."). LaCroix stopped supervising Plaintiff in 2013, years before the relevant allegations involving Gwiazdzinski, DeNunzio, and Schultz in 2016 and 2017. (Marasco Report at 39:825–26.) Marasco reported that LaCroix could offer "no specific instances of discrimination" and could not "affirm

that the unfair treatment which Tanya received was based upon her race." (*Id.* at 41:851–56.) To the extent LaCroix relayed more detailed allegations related to Phillips, Plaintiff offers no connection between Phillips's attitude and Plaintiff's termination. Plaintiff's complaint to the human resources on October 27, 2017 was made almost one year after Phillips had left the company, (Phillips Dep. at 8:13–16), and made no mention of discriminatory treatment by Phillips. (*See generally* Discrimination Intake Report.) Phillips was not present at the meeting where Ryan recommended terminating Plaintiff, nor is there any suggestion that information Phillips provided was relied on at that meeting. Therefore, there is no causal connection between LaCroix's comment about Phillips and Plaintiff's termination years later. *See Ezold*, 983 F.2d at 545 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *see also McCann v. PNC Fin. Servs. Grp., Inc.*, No. 18-13909, 2020 WL 4915704, at *7 (D.N.J. Aug. 21, 2020) (comment by a coworker that the defendant company "does not like to see Black men [like plaintiff] in commercial banking roles" was insufficient to rebut defendant's nondiscriminatory reason for termination because the commenter "was not in a position where she had insight into the decision to terminate Plaintiff").

Finally, Plaintiff relies on the fact that she was the only African American employee in her group and that after she was fired, she was replaced with a white man. (Pl.'s SOF ¶¶ 19–20; Pl.'s Br. at 10.) "[T]he fact that Plaintiff was the only member of a protected class in his department" does not create an inference of discrimination. *Dvoskin v. Bio-Reference Lab'ys, Inc.*, No. 18-10667, 2021 WL 2134938, at *5 (D.N.J. May 26, 2021) (citation omitted); *see also Sessoms v. Trustees of Univ. of Pa.*, No. 16-2954, 2017 WL 2271817, at *5 (E.D. Pa. May 24, 2017) (employer's adverse employment action against the department's only African American

employee was "not sufficient to raise an inference of discrimination"), *aff'd*, 739 F. App'x 84 (3d Cir. 2018); *Perry v. New Jersey Dep't of Corr.*, No. 21-3523, 2023 WL 3742850, at *5 (D.N.J. May 31, 2023) (same). Moreover, that the four individuals who temporarily filled Plaintiff's role after she was fired were white men does not suggest discrimination, (Schultz. Dep. at 93:20–95:9), as all four were employees of Defendant whose qualifications for her position Plaintiff does not challenge and whose disciplinary history Plaintiff does not suggest is comparable to her own, *see Mosca v. Cole*, 217 F. App'x 158, 162 (3d Cir. 2007) ("[T]he fact that a plaintiff's replacement is of a different race, without more, is not enough."); *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 309 (D.N.J. 2016) ("[S]imply identifying her replacement by race is not enough to establish discrimination."). This is especially true where the plaintiff "has not identified a job description that [her replacement] failed to meet, and [the replacement's] qualifications were evidently well known to [the employer]." *Geddis v. Univ. of Delaware*, 40 F. App'x 650, 653 (3d Cir. 2002).

Therefore, none of the evidence Plaintiff points to, either singly or in combination with any other evidence, carries Plaintiff's burden to establish her *prima facie* case that racial discrimination was the but-for cause of her termination. Nonetheless, the Court proceeds to Step Two and Step Three of the *McDonnell Douglas* analysis.[13]

b.   <u>Step Two: Defendant's Nondiscriminatory Justifications</u>

Under the second step of the burden-shifting test, Defendants must meet a "relatively light burden" of setting forth a "nondiscriminatory reason for the unfavorable employment decision."

---

[13] Proceeding to Defendant's nondiscriminatory reasons and Plaintiff's arguments of pretext is also appropriate because Plaintiff may establish causation by arguing pretext. *See Wesley*, 3 F. Supp. 3d at 232 ("Even demonstrating sufficient pretext for the proffered legitimate reason offered by an employer can establish causation." (citing *Zelinski v. Pa. State Police*, 108 F. App'x 700, 707 (3d Cir. 2004))). Thus, the Court will consider whether Plaintiff's showing of pretext can bolster her *prima facie* case.

*Fuentes*, 32 F.3d at 763. To explain Plaintiff's termination, Defendant points to concerns raised about Plaintiff's violations of Defendant's compliance policies, which resulted in Vecchi's report sustaining the complaints. (Def.'s Br. at 21–23.) Ryan, a senior director in Defendant's compliance department, relied on the report and information he learned at a subsequent meeting with Plaintiff's supervisors and members of Defendant's human resources department in his recommendation to fire Plaintiff. (*Id.* at 23.)

The violation of company policy constitutes a "legitimate, nondiscriminatory justification" for discharging an employee. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 (3d Cir. 2017). The Third Circuit routinely affirms district court decisions finding nondiscriminatory justifications for adverse employment actions on this ground. *See, e.g.*, *Vaughan v. Boeing Co.*, 733 F. App'x 617, 623 (3d Cir. 2018) (five instances of employee violating employer's safety and overtime policies); *Parikh v. UPS*, 491 F. App'x 303, 307 (3d Cir. 2012) (two instances of employee falsifying his time cards); *Claiborne v. Se. Pa. Transp. Auth.*, No. 21-3305, 2022 WL 4180977, at *2 (3d Cir. Sept. 13, 2022) (employee's multiple violations of attendance policy); *Dinnerstein v. Burlington Cnty. Coll.*, 764 F. App'x 214, 218 (3d Cir. 2019) (employee's several violations of employer's civility policy).

The Court finds that Defendant has substantiated a nondiscriminatory reason for Plaintiff's termination based on her numerous compliance violations. A key role Plaintiff performed in Defendant's marketing efforts was educating companies about Defendant's pharmaceutical products, which she did by organizing speaker programs that involved recruiting physicians to speak about Defendant's products. (Def.'s SOF ¶¶ 15–16; Hughes Dep. at 96:22–97:23.) This process is heavily regulated by state and federal law, as Plaintiff acknowledged at her deposition. (Def.'s SOF ¶¶ 19–20; Hughes Dep. at 100:9–24.) To that end, Defendant's policies—which

Plaintiff was trained on—specified procedures for how the company could contract with speakers and how their compensation would be determined, with the baseline requirement that any speakers were paid FMV and any deviation from this amount must be authorized through compliance with certain procedures. (Def.'s SOF ¶¶ 18, 21–22, 24, 90.)

Nonetheless, two of Defendant's employees—in the legal and compliance departments—raised concerns about Plaintiff's compliance with the speaker policies. In May 2017, Duffield emailed Plaintiff, concerned that in planning a speaker program, Plaintiff did not have speakers sign Defendant's promotional speaker contract and did not base their compensation on FMV. (Def.'s SOF ¶ 87.) In October 2017, Spicehandler reported his concerns that Plaintiff's speaker programs "did not appear to follow process for contracts, FMV, approval process or needs assessment documentation." (Ex. 24 to Hughes Dep., ECF No. 43-5 at *65; Def.'s SOF ¶¶ 88–90.) Spicehandler's report led to Vecchi's investigation which found that Plaintiff had "increase[d] a [] speaker's fee [by $1,000 per engagement] for 2017, at the speaker's request" without "a proper FMV assessment or exception request." (Vecchi Report at 1.) Plaintiff agreed that increasing the speaker fee by $1,000 without conducting a FMV assessment violated Defendant's Speaker Policy. (Def.'s SOF ¶ 103.)[14]

Other problems related to Defendant's use of her corporate credit card. Gwiazdzinski had issued Plaintiff formal warnings in May and November 2016 related to Plaintiff's failure to pay off her corporate credit card on time. (*Id.* ¶¶ 53–56.) Schultz raised similar concerns after he became Plaintiff's manager in mid-2017, referencing his earlier conversation with Plaintiff about

---

[14] Vecchi also found that Plaintiff had committed other violations relating to the speakers programs. Plaintiff expensed a speaker's airfare and hotel for an April 2017 program to Plaintiff's corporate credit card and did not timely submit the speaker's travel expenses for reimbursement. (Def.'s SOF ¶¶ 105–06.) Further, Plaintiff organized the speaker program using an improper computer system and outdated program structure that did not comply with Defendant's speaker policies. (*Id.* ¶¶ 104, 107.)

"potential violations of expense reporting policy." (*Id.* ¶¶ 91–94; Schultz Oct. 26 Email.) Schultz also recorded that Plaintiff had charged other employees' hotel room expenses and a speaker's flight expense to her credit card in violation of Defendant's policy. (*Id.*) Vecchi's investigation sustained these complaints. (Def.'s SOF ¶ 106.) At his deposition, Schultz testified that an employee's "expense compliance violations" could result in termination. (Schultz Dep. at 31:23–32:10.)

These violations were the basis for Ryan's decision to recommend firing Plaintiff. Ryan received Vecchi's report and convened a meeting on February 21, 2018 regarding the appropriate discipline for Plaintiff. After the meeting, Ryan elevated his recommendation to firing Plaintiff. (Def.'s SOF ¶¶ 113–14.) Ryan wrote that his decision was based on Vecchi's report, which "substantiated numerous violations of Company policy by [Plaintiff]," as well as other of Plaintiff's "behaviors that were not part of the compliance investigation but that present additional risk to the Company." (Ryan Feb. 2018 Email Chain at *24–25.) Plaintiff was terminated shortly afterwards. (Def.'s SOF ¶¶ 124–26.)

Defendant's decision to fire Plaintiff was also based on the repeated nature of Plaintiff's violations and her failure to accept corrective guidance. Ryan recalled reviewing Plaintiff's performance reviews that reflected that her compliance issues were "a recurring theme." (Ryan Dep. at 36:23–37:11.) Ryan wrote that Plaintiff "has not demonstrated the ability or willingness to apply guidance" from her supervisors or the compliance department and that he saw a "pattern of failing to take accountability" reflected in "reoccurring issues with expense reporting (including credit card delinquencies) and speaker programs that cannot be explained by a lack of understanding of policies." (Ryan Feb. 2018 Email Chain *24–25.) Ryan concluded that it was therefore "likely that [Plaintiff] will have further compliance infractions." (*Id.*; *see also* Ryan Dep.

at 38:10–21 ("[S]omeone at [Plaintiff's] position should have been aware of these policies, had received guidance from the legal department[,] and chose not to follow it."); Vecchi Report (finding that Plaintiff had "disregarded the policy requirements and advice provided by Legal and Compliance"); Plaintiff's 2016 Evaluation at 7, 9 (noting that Plaintiff had "refused to work with Legal . . . to try to secure approval of this initiative").)

Therefore, the Court concludes that even had Plaintiff established her *prima facie* burden, Defendant has offered a nondiscriminatory rationale for her termination at Step Two.

### c.    Step Three: Pretext

Because Defendant satisfied the second prong of *McDonnell Douglas*, the burden shifts back to Plaintiff to "show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763. A plaintiff may generally demonstrate pretext by offering evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764 (citations omitted). To discredit the employer's nondiscriminatory reason:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence . . . .

*Id.* at 765 (cleaned up) (citing *Ezold*, 983 F.2d at 531, 553). In applying this analysis, courts are cautious to not act as "'a super-personnel department' tasked with correcting unduly harsh employment actions." *Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80 (3d Cir.

2015) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)). At Step

Three, Plaintiff must make a "second showing of causation 'to satisfy her ultimate burden of

persuasion by proving pretext.'" *Watson v. Pa. Dep't of Revenue*, 854 F. App'x 440, 442 (3d Cir.

2021) (quoting *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017)).

Plaintiff sets forth several arguments that the compliance violations Defendant relies on

were pretextual. (Pl.'s Br. at 9–11.) *First*, Plaintiff argues that there are mitigating facts that

undermine Defendant's argument that her compliance violations were as serious as Defendant

claims. *Second*, Plaintiff points to the fact that Ryan's initial recommendation was to issue her a

written warning, rather than to terminate her, and Ryan only changed his find following a meeting

with DeNunzio, Schultz, and others. *Third*, Plaintiff points to DeNunzio's October 26, 2017 email

to Schultz and DeNunzio's presence at the February 21, 2018 meeting to suggest that DeNunzio's

alleged discriminatory intent infected Ryan's decision to recommend firing Plaintiff.

The Court finds that Plaintiff's evidence cannot meet her burden at Step Three to show

such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its actions," *Fuentes*, 32 F.3d at 765, such that a

reasonable jury could reject Defendant's nondiscriminatory basis for Plaintiff's termination.

Plaintiff argues that there are mitigating facts that undermine the apparent seriousness of

her compliance violations. With respect to the speaker fees, Plaintiff points to her testimony that

Duffield had told her that an FMV assessment was unnecessary for speakers from certain types of

companies and that someone from the legal department, rather than Plaintiff, would handle the

FMV assessment. (Pl.'s SOF ¶ 9.) However, Plaintiff agreed that whatever Duffield may have said

to her, his subsequent email clearly instructed her to conduct a FMV assessment. (Hughes Dep. at

165:3–15.) Plaintiff further agreed that Defendant's policy required her to submit an exception

request if she did not pay a speaker FMV, and that she did not do so for Dr. McInnis. (*Id.* at 197:25–198:14.) Even had Plaintiff adhered to Defendant's speaker policy, Duffield and another employee seeking to confirm the program's compliance had to follow up repeatedly with Plaintiff in May 2017, and eventually sought Schultz to intervene, because Plaintiff did not respond to their inquiries. (Ex. 23 to Hughes Dep., ECF No. 43-5 at *60–61.) The fact that Plaintiff did not cooperate with attempts to confirm the program's compliance offers additional support for the seriousness of the conduct and was a further reason Ryan recommended her termination. (*See* Ryan Feb. 2018 Email Chain at *24–25 ("[Plaintiff] has not demonstrated the ability or willingness to apply guidance received from legal and/or line management to ensure she is doing her job in a compliant manner going forward.").)

With respect to her expense reporting, Plaintiff testified that charges to her corporate credit card for a speaker's airfare and hotel, incurred in violation of Defendant's policies, were due to an error by the hotel. (Pl.'s SOF ¶ 11.) Plaintiff also points out that all of her credit card expenses were ultimately approved. (*Id.* ¶¶ 10–11; Pl.'s Br. at 10.) However, the fact that Plaintiff's expenses were approved does not countervail Defendant's evidence that Plaintiff repeatedly violated the expense policy. Gwiazdzinski issued Plaintiff two official warnings in 2016, (Def.'s SOF ¶¶ 53–56), Schultz talked to Plaintiff repeatedly about her expense practices, (Hughes Dep. at 257:14–258:8), and Vecchi's investigation sustained Plaintiff's violations of Defendant's expense policies, (Vecchi Report at 2–3). As Schultz explained to Plaintiff over email on October 26, 2017, the problem with Plaintiff's practice was not necessarily "the legitimacy of the trip, program, or speaker," but rather how the expenses were reported. (Schultz Oct. 26 Email.) Therefore, the Court finds no pretext in Defendant basing its termination decision in part on Plaintiff's violation of the credit card policies.

Plaintiff also relies on Ryan changing his recommendation from a written warning to termination to suggest that Defendant's justification was pretextual. Upon first reviewing Vecchi's report, Ryan recommended issuing Plaintiff a written warning, (Def.'s SOF ¶¶ 109–110), which he upgraded to termination after the February 21, 2018 meeting. (*Id.* ¶ 112.) Plaintiff argues that the core allegations related to her compliance violations were contained in Vecchi's report—which Ryan had reviewed at the time he recommended a written warning—and that therefore Ryan must have been improperly influenced at the February 21 meeting. (Pl.'s SOF ¶ 16.) However, while Plaintiff's compliance violations were summarized in Vecchi's report, Ryan testified, supported by his contemporaneous email, that the reason for the change was that he learned at the meeting about the repeated nature of the violations and the fact that Plaintiff failed to take direction from her supervisors or employees in Defendant's legal and compliance departments. (Ryan Dep. at 36:23–37:11; Ryan Feb. 2018 Email Chain at *24–25.) Therefore, the change in Ryan's decision does not undermine Defendant's reason for Plaintiff's termination or cast the ultimate decision in a discriminatory light.[15]

Finally, the Court finds that Plaintiff's theory that DeNunzio was determined to fire her for an illegal, discriminatory reason and prevailed upon Ryan at the February 21 to change his recommendation is unsupported by any evidence in the record. Plaintiff relies primarily on DeNunzio's response to Schultz's October 26 email forwarded to him, in which DeNunzio wrote that he was "unfamiliar with expense violations and action steps needed" and that "[i]f any grounds for dismissal allowed, let me know as we might need to push I'm guessing." (Schultz Oct. 26 Email.) Plaintiff, who declined to depose DeNunzio, points to no witness testimony that offers any

---

[15] Further, Ryan explained that there was no precedent at the company for how to discipline an employee for compliance violations like Plaintiff's. (Def.'s SOF ¶ 111.) Schultz testified, and Gwiazdzinski told Plaintiff, that credit card expense violations were a terminable offense. (*Id.* ¶ 56; Schultz Dep. at 31:23–32:10.)

context for the statement that suggests an insidious motive. Even if DeNunzio was, as Plaintiff suspects, eager to fire Plaintiff, there is no suggestion that he was motivated either by Plaintiff's race or in retaliation for her alleged complaints of discrimination.[16]

As Defendant notes, (Def.'s Reply Br. at 9), Plaintiff's argument about DeNunzio is essentially a "cat's paw" argument. Under this theory, when a "supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action," if that results in the employee's termination, the company may be liable even if the ultimate decisionmaker lacked discriminatory animus. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)). However, success on this theory requires showing not just but-for causation but proximate causation. *Id.* Putting aside the fact that there is no evidence that DeNunzio was motivated by racial or retaliatory animus, there is ample evidence that multiple other employees of Defendant complained of Plaintiff's compliance violations, that a compliance investigation sustained those complaints, and that an independent member of Defendant's risk and compliance team made the decision to terminate Plaintiff. This is distinguishable from the evidence that could substantiate a cat's paw theory, "where there was no evidence that the employer relied on anything besides the allegedly biased supervisor's say-so in deciding to terminate the employee." *Id.* at 331 (citing *McKenna v. City of Philadelphia*, 649 F.3d 171, 179 (3d Cir. 2011)).

---

[16] Plaintiff also argues that she was "on the verge of being transferred for an assistant director position" under a different manager than DeNunzio, (Pl.'s SOF ¶ 18), and that DeNunzio had been "stonewalling" the final step "for weeks" in order to "orchestrat[e] Plaintiff's termination" instead, (Pl.'s Br. at 11). However, while the email Plaintiff relies on for this argument suggests that Plaintiff was being considered for a different position at Defendant, it does not suggest that she was imminently about to be transferred or that DeNunzio stood in the way of her transfer. (Ex. G to Pl.'s SOF, ECF No. 47-8.) In any event, the basis for Plaintiff's termination was not that she was performing poorly in her current position at the company, but rather that her repeated failure to adhere to company policies was a compliance risk. Therefore, Defendant's reason for firing her is not contradicted by the possibility that she would be transferred to a different role.

The Court's reasoning here mirrors the facts and the Third Circuit's analysis in its unpublished decision in *Maslanka v. Johnson & Johnson, Inc.*, 305 F. App'x 848 (3d Cir. 2008). There, Maslanka, a sales representative for the pharmaceutical company Janssen, was assigned to invite one of his clients, a doctor, to a conference the company was hosting regarding one of its drugs. *Id.* at 850. Maslanka informed the doctor that the doctor would be responsible for paying for his spouse's airline ticket if she accompanied the doctor to the conference. *Id.* However, Maslanka offered to arrange travel for the doctor and his wife using his corporate credit card, on the understanding that the doctor would reimburse Maslanka for the cost of his wife's ticket. *Id.* Two months later, Janssen fired Maslanka for violating its healthcare compliance policy by paying for the doctor's wife's travel tickets with his corporate card. *Id.*

Maslanka sued, alleging that his Janssen discriminated against him based on his disability and fired him in retaliation for filing several complaints with the Equal Employment Opportunity Commission. *Id.* at 850–51. The district court granted summary judgment to the employer, and the Third Circuit affirmed. With respect to the employer's Step Two justification and the plaintiff's pretextual arguments, the Third Circuit held:

> We agree with the District Court's reasoning and conclusion that Maslanka failed to raise a genuine issue of material fact regarding whether Janssen's reason for firing him was pretextual. Janssen submitted evidence that Maslanka was fired because he violated the company's health care compliance policy. Maslanka did not dispute that he used his corporate credit card to pay for [the doctor's wife's] airline ticket or that Janssen's long-standing policy prohibited charging a spouse's travel costs to the company. ... Janssen's reasons for terminating him were plausible and consistent with its policy. The remainder of Maslanka's arguments, that he did not include the cost of the airline ticket for [the doctor's] wife in his expense report because [the doctor] was going to reimburse him for it and that no one at Janssen told him that he was violating the policy at the time, are excuses for his conduct or arguments against his firing, not facts that raise a question as to the legitimacy of Janssen's reasons for firing him.

*Id.* at 853. The Third Circuit concluded that it was insufficient "for Maslanka to show that Janssen's decision to fire him was unfair, wrong, or mistaken," but that he must instead "point to evidence suggestive of discrimination." *Id.*

The Third Circuit's reasoning in this unpublished case is highly persuasive here. Like Maslanka, Plaintiff worked in a role at a pharmaceutical company in which her interactions with doctors subjected her employer to regulatory risk (or worse) if strict policies were not followed. Also like Maslanka, Plaintiff acknowledged that her conduct violated her employer's policies, and Plaintiff's well-documented history of violations further supports Defendant's reasons for terminating Plaintiff as consistent with its policy. While Plaintiff offers "excuses for [her] conduct or arguments against [her] firing," she has not offered "facts that raise a question as to the legitimacy of [Defendant's] reasons for firing [her]. *Id.* at 853. Ultimately, Plaintiff's pretext arguments must fail because an employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Watson*, 854 F. App'x at 442 (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Even viewed in the light most favorable to Plaintiff, her termination was the culmination of two years of documented compliance violations, rather than the product of discriminatory animus.

Therefore, the Court concludes that even if Plaintiff had met her burden at Step One to establish that a *prima facie* case of discrimination, Defendant has offered a nondiscriminatory reason for her termination that Plaintiff has failed to rebut. Summary judgment will be granted for Defendant on Plaintiff's Section 1981 race discrimination claim.

### 3. Plaintiff's Retaliation Claims

a. Ability to Pursue a Section 1981 Retaliation Claim Absent a Viable Underlying Section 1981 Discrimination Claim

Before reaching the *McDonnell Douglas* balancing test on the retaliation claim, the Court must address an issue not raised by either party. In this Circuit, a Section 1981 retaliation claim is not viable without an underlying Section 1981 discrimination claim. Given the Court's decision on the discrimination claim, Plaintiff's retaliation claim fails as well.

The Third Circuit instructs that "[i]n a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation." *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451–53 (2008)). Courts within this District follow this instruction literally, dismissing Section 1981 retaliation claims where there is no discrimination claim on which to found it. *See Vidal v. Galaxy 2439 Enterprises, LLC*, No. 23-1845, 2023 WL 8455255, at *10 (D.N.J. Dec. 6, 2023) (Shipp, J.) (dismissing retaliation claim because plaintiff had failed to plead an underlying Section 1981 violation); *Theodore v. Newark Dep't of Health & Cmty. Wellness*, No. 19-17726, 2022 WL 475616, at *6 (D.N.J. Feb. 16, 2022) (Martini, J.) (same); *Republic Grp., LLC v. Bank of Am., N.A.*, No. 21-14634, 2022 WL 170872, at *3 (D.N.J. Jan. 18, 2022) (Wigenton, J.) (same); *Sutton v. Bd. of Educ. of the City of Plainfield*, No. 13-5321, 2015 WL 9308251, at *10 n.16 (D.N.J. Dec. 22, 2015) (Arleo, J.) (same).

Furthermore, the structure of the analysis in *Oliva* as well as subsequent Third Circuit decisions support a strict reading. In *Oliva*, before discussing the elements of the *prima facie* case, the Court noted that the record "would justify a reasonable factfinder to conclude that [the police officer plaintiff's supervisors] demonstrated" to the plaintiff how to unlawfully racially profile motorists in conducting traffic stops, which "[o]f course . . . would violate section 1981[] . . . ."

604 F.3d at 798. Only then did the Court proceed to the elements of the plaintiff's *prima facie* case. *Id.* More recently in *Castleberry*, the Court quoted *Oliva*'s instruction verbatim without caveat. 863 F.3d at 267. In a footnote to the unpublished decision in *Anderson v. Boeing Co.*, the Third Circuit noted that a plaintiff's burden for establishing a *prima facie* case for retaliation is identical under Title VII and Section 1981, except that a Section 1981 claim "carries the *additional* requirement that [the plaintiff] show an underlying § 1981 violation." 694 F. App'x 84, 88 n.11 (3d Cir. 2017) (emphasis added).[17]

Therefore, summary judgment must be granted on Plaintiff's retaliation claim because, in light of the decision above, Plaintiff now lacks a viable Section 1981 discrimination claim. However, because the parties do not address this point and for the avoidance of doubt, the Court will proceed to the *McDonnell Douglas* analysis for Plaintiff's retaliation claim.

b.   *McDonnell Douglas* Analysis on Retaliation Claim

As noted above, Plaintiff's Section 1981 retaliation claim is subject to the *McDonnell Douglas* burden-shifting analysis. *See Canada*, 49 F.4th at 346; *see also Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981

---

[17] The Court notes that strictly applying the Third Circuit's instruction in *Oliva* would bar a Section 1981 retaliation claim where a plaintiff may have believed in good faith that she was reporting workplace discrimination, even if she was ultimately unable to prove out the discrimination claim. A handful of nonbinding decisions have questioned such an application of *Oliva*. *See Hawkins v. The Ctr. for Spinal Surgery*, No. 12-1125, 2015 WL 4168388, at *2 (M.D. Tenn. July 9, 2015) (declining to follow *Oliva* because "[t]he Supreme Court case on which *Oliva* relies . . . does not support the *Oliva* court's determination that there must be an underlying § 1981 violation in order to establish a § 1981 retaliation claim"); *Claybourne v. HM Ins. Grp.*, No. 14-1412, 2015 WL 7444644, at *1 (W.D. Pa. Nov. 23, 2015) (declining to read *Oliva*'s instruction strictly). Another court within this Circuit to have directly considered these arguments surveyed other Circuit Courts of Appeal and found that "the Third Circuit is alone in its judgment to require evidence of an underlying violation." *Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 757 (E.D. Pa. 2014). However, the court in *Ellis* declined the plaintiff's invitation to permit a Section 1981 retaliation claim to proceed absent a viable discrimination claim, noting that "for a court to rule consistent with these nonprecedential decisions and ignore *Oliva*'s underlying-violation requirement would usurp Third Circuit authority and be in derogation of this Court's obligations." *Id.* For the same reasons, this Court will also read *Oliva*'s instruction strictly.

are generally identical to the elements of an employment discrimination claim under Title VII."). To establish a *prima facie* retaliation claim in violation of Section 1981, Plaintiff must show that "(1) [she] engaged in protected activity, (2) [her] employer took an adverse employment action against [her], and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action." *Oliva*, 604 F.3d at 798 (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006)). Because Defendant offers a nondiscriminatory reason for Plaintiff's termination—the policy violations described *supra*, Section III.A.2.b—Plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's justification to survive summary judgment. *Fuentes*, 32 F.3d at 765.

The Court's analysis on the parties' arguments on Plaintiff's retaliation claim mirrors its analysis on the discrimination claim. Several arguments and evidence bear separate discussion as they are implicated more clearly by Plaintiff's retaliation claim.

Plaintiff's retaliation claim is premised on her belief that her poor performance reviews, her supervisors' and the compliance department's investigation into her policy violations, and her ultimate termination for those violations, occurred because she complained about discrimination on three occasions. (Pl.'s Br. at 9–10.) Plaintiff's first two complaints related to her belief that she did not receive the 2015 Award because of her race. Plaintiff testified that she talked to Gwiazdzinski in approximately February 2016 and relayed her belief that she felt she did not receive the Award due to racial discrimination. (Def.'s SOF ¶ 38; Hughes Dep. at 47:3–48:9.) In her comments to her 2016 performance evaluation, dated February 28, 2017, Plaintiff wrote that she had "made [Gwiazdzinski] aware back in February 2016 that because my name was removed from the Presidents Award for Saxenda I felt discriminated against." (Plaintiff's 2016 Evaluation

at 17–18.) On October 27, 2017, Plaintiff filed her official complaint with the human resources department complaining of discrimination beyond her not receiving the Award. (Discrimination Intake Report at 1.)

Initially, Plaintiff's evidence that either Gwiazdzinski or DeNunzio were aware of her discrimination complaints in February 2016 and February 2017 in connection with the Award is thin. Gwiazdzinski recalled Plaintiff talking to her about the Award in February 2016 but does not remember Plaintiff mentioning discrimination. (Gwiazdzinski Dep. at 21:13–22:4.) Gwiazdzinski acknowledged that she had the opportunity to review Plaintiff's February 2017 comments but testified that she did not remember reading any mention of discrimination and therefore did not raise Plaintiff's concern about discrimination to human resources. (*Id.* at 19:8–22:9, 36:17–23.) By the time she delivered Plaintiff's 2016 review in February 2017, Gwiazdzinski was no longer Plaintiff's supervisor, making it unlikely she would have reviewed Plaintiff's comments. (Pl.'s C-SOF ¶ 139.) Plaintiff does not allege that she ever spoke with DeNunzio in 2016 about the Award. In a statement to Marasco, DeNunzio, whose name is listed on the 2016 review as Gwiazdzinski's supervisor, denied reviewing Plaintiff's comments and "did not know why his name was reflected on it, though suspected that he approved the same for its submission into the system as final." (Marasco Report at 46:955–57.) Plaintiff offers no evidence that DeNunzio in fact saw her comments made in February 2017.

For purposes of summary judgment, the Court assumes that Plaintiff's testimony that she mentioned discrimination to Gwiazdzinski in 2016 and 2017 is true. However, even so, Plaintiff offers no basis to conclude that either supervisor's subsequent actions were retaliatory or tied to the ultimate adverse employment action—Plaintiff's February 2018 termination. Plaintiff agreed with Gwiazdzinski that Gwiazdzinski had no role in the decision whether Plaintiff would receive

the Award. (Hughes Dep. at 46:23–47:2; Gwiazdzinski Dep. at 16:1–17:24, 18:7–9.) Plaintiff also makes no allegation that DeNunzio was involved in giving the Award. Therefore, there is no basis to conclude that Plaintiff's purported complaint in February 2016 and February 2017 about the Award would cause Gwiazdzinski or DeNunzio to retaliate against her. As Plaintiff agreed, the reason she did not receive the Award was because LaCroix made a mistake, which Gwiazdzinski believed was rectified when Plaintiff received a $1,200 bonus and award. (Hughes Dep. at 40:16–22; Def.'s SOF ¶¶ 37, 41.) Gwiazdzinski left the company shortly after she stopped supervising Plaintiff in the fall of 2016, (*id.* ¶¶ 25–26), and was far removed from the process that led to Plaintiff's termination in February 2018. DeNunzio participated in the February 21, 2018 meeting with Ryan, (Ryan Dep. at 441:7–13), but Plaintiff offers no evidence of what he contributed or how it affected Ryan's recommendation.

Plaintiff's showing of causation is fatally undercut by the disconnect between her complaints about discrimination and the employees of Defendant who investigated her for compliance violations and ultimately decided to fire her. Ryan was the ultimate decisionmaker in Plaintiff's termination, which Plaintiff does not contest. (Def.'s SOF ¶ 118.) It is undisputed that at the time Ryan made his recommendation, he was unaware of Plaintiff's race or that she had ever raised concerns about race discrimination. (*Id.* ¶¶ 120–23.) There is no evidence adduced that Ryan knew about Plaintiff's complaints at the time he recommended Plaintiff's termination. *See Sarullo*, 352 F.3d at 801 (holding that plaintiff failed to make a *prima facie* showing of retaliation when he "provided no evidence to rebut [the employer's] declaration that he was unaware of [the protected activity] when he made his decision" to terminate the employee). Plaintiff points to no evidence that Duffield (who raised concerns about Plaintiff's speaker program), Spicehandler (whose

complaint instigated Vecchi's investigation), or Vecchi herself (whose investigation sustained the complaints), knew that Plaintiff had ever complained of discrimination.[18]

The fact that Plaintiff was fired four months after she made her official complaint to human resources on October 27, 2017 does not undermine the reason for her termination. The Third Circuit has found that adverse employment action that follows shortly on the heels (*i.e.* "two days") of an employee complaining of discrimination "is unusually suggestive of causation." *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)). However, the Third Circuit has elsewhere held that "a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." *Id.* (citing *Farrell*, 206 F.3d at 280). Thus, if the time gap between complaint and termination is more than a few days, the Court must look for other evidence that could "suggest retaliatory motive." *Id.* at 186. The reasoning of these cases does not support Plaintiff's claim because concerns about Plaintiff's compliance violations by Gwiazdzinski, Schultz, Duffield, and Spicehandler were raised before Plaintiff's October 2017 complaint. Although Plaintiff's termination followed her complaint by several months, the termination resulted from the investigation sparked by Spicehandler's complaint. Therefore, the factfinder could not infer that the investigation and termination resulted from Plaintiff's alleged complaint of discrimination, despite the order of events.

In sum, the two complaints Plaintiff lodged in 2016 and 2017 regarding not receiving the 2015 President's Award are too attenuated from her termination in 2018 for multiple violations of

---

[18] These purported complaints are even further removed from Schultz, who did not work at Defendant at the time Plaintiff did not receive the Award or complain about not receiving it. Hughes believed that Schultz was treating her differently based on her earlier complaints to Gwiazdzinski, despite agreeing that she had no knowledge of whether Gwiazdzinski had ever shared Hughes' complaints with Schultz. (Hughes Dep. at 303:19–304:5.) However, Plaintiff cannot survive summary judgment based on "inferences and assumptions." *Williams v. Rowan Univ.*, No. 10-6542, 2014 WL 7011162, at *15 (D.N.J. Dec. 11, 2014) (citing *Johnson*, 493 F. App'x at 292).

Defendant's policies, *see* Section III.A.2.b, *supra*, that the Court finds that no reasonable jury could infer a causal connection between the two. While the October 2017 discrimination complaint was closer in time to Plaintiff's termination, at that point Plaintiff already had a well-documented history of policy violations and an investigation by Defendant's compliance department, on which her termination was based, was underway. Therefore, the Court finds that Plaintiff has failed to make out a *prima facie* case of retaliation, and that even if she had, she has failed to offer evidence establishing that Defendant's reason for her termination was pretextual. Summary judgment must be granted for Defendant on Plaintiff's Section 1981 retaliation claim for this independent reason.

### B.    PLAINTIFF'S FAMILY MEDICAL LEAVE ACT CLAIMS

Defendant also seeks summary judgment on Plaintiff's FMLA interference and retaliation claims. (Compl. ¶¶ 77–91.) Defendant argues that any FMLA claims are time-barred by the FMLA's two-year statute of limitations because more than two years have elapsed between Plaintiff's termination and the filing of her federal suit. (Def.'s Br. at 7–8.) Defendant further argues that no evidence of a willful FMLA violation exists such that the FMLA's time bar can be extended to three years. (*Id.* at 8–10.) Defendant contends that even if the claims were not time-barred, Plaintiff cannot establish a claim for FMLA retaliation because her manager encouraged her to take FMLA leave and there is no evidence that the employees of Defendant involved in the decision to fire Plaintiff knew she had applied for FMLA leave. (*Id.* at 11–13.) Despite the fact that Defendant devoted eight pages of its moving brief to Plaintiff's FMLA claims, (*id.* at 7–15), Plaintiff's opposition brief is silent regarding her FMLA claims and focuses solely on her race discrimination and retaliation claims, (*see generally* Pl.'s Br.). On reply, Defendant argues that Plaintiff's silence constitutes abandonment of her FMLA claims. (Def.'s Reply Br. at 4–5.)

The Court finds that Plaintiff's failure to address Defendant's arguments on her FMLA claims indeed constitutes abandonment. Once a defendant meets its moving burden to show its right to summary judgment, the plaintiff must point the Court to facts on the record that establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248. A nonmoving party cannot argue "that there is evidence in the record that creates a genuine issue of material fact, if that evidence was not pointed out to the district court at the time of the motion for summary judgment." *Player v. Motiva Enters., LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007) (citing *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988)) (affirming district court's grant of summary judgment to defendant without addressing plaintiffs' claim because "in response to [defendant's] motion for summary judgment, Plaintiffs did not mention their claim").[19]

Defendant has established that Plaintiff's FMLA claims are time-barred because they were filed after the two-year statute of limitations. *See Seifart v. Pa. Human Rels. Comm'n*, 301 F. App'x 194, 196 (3d Cir. 2008) (citing 29 U.S.C. § 2617(c)(1)). Plaintiff was terminated on February 28, 2018 (Def.'s SOF ¶¶ 124–26), Liberty Mutual denied her FMLA request on March 1, 2018, (*id.* ¶ 173), and Plaintiff filed suit on April 23, 2020, (*see* Compl.). Because Plaintiff failed to file suit by March 1, 2020, her claim is time-barred. Plaintiff makes no argument and points to no evidence that could support a finding that Defendant willfully violated Plaintiff's FMLA rights, such that the statute of limitations should be extended. *See, e.g.*, *Blades v. Burlington Cnty. Jail*, No. 02-3976, 2007 WL 674687, at *7 (D.N.J. Feb. 28, 2007) (granting summary judgment on FMLA claim on statute of limitations ground because "Plaintiff offers no evidence that Defendant

---

[19] Courts routinely treat a plaintiff's silence in the face of a defendant seeking summary judgment on a claim as abandonment of that claim. *See Daughtry v. Fam. Dollar Stores, Inc.*, No. 09-5111, 2011 WL 601270, at *8 (D.N.J. Feb. 16, 2011) (granting defendant's motion for summary judgment on claims plaintiff abandoned by failing to address in its summary judgment opposition); *Varney v. BJ's Wholesale Club, Inc.*, No. 07-47, 2008 WL 2944650, at *7 (D.N.J. July 31, 2008) (same); *Ellis v. Ethicon, Inc.*, No. 05-726, 2008 WL 11518702, at *6 n.5 (D.N.J. Mar. 28, 2008) (same).

knew of or showed reckless disregard for the matter of whether its conduct was prohibited by statute").

Even if Plaintiff's claims were not time-barred, summary judgment would be granted because Plaintiff cannot make out a *prima facie* case of FMLA retaliation. To show retaliation under the familiar *McDonnell Douglas* framework, Plaintiff would have to demonstrate that her termination was "causally related" to her request for FMLA leave. *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 122 (D.N.J. 2020) (citation omitted). There is no evidence of a causal link here. Ryan, who recommended Plaintiff's termination, did not know that Plaintiff had applied for FMLA leave. (Def.'s SOF ¶¶ 120–21.) Plaintiff did not even apply for FMLA leave until February 20, 2018, approximately one week after Vecchi issued her report regarding Plaintiff's compliance violations. (*Id.* ¶¶ 166–67.) As the Third Circuit wrote affirming the district court's grant of summary judgment in a factually analogous matter, "[Plaintiff] provides no evidence that the [Defendant's] employees who fired him had any knowledge of the FMLA filing. Although [Plaintiff] was fired only one day after he requested the FMLA paperwork, the record indicates he had been under investigation by the Department for months." *Watson*, 854 F. App'x at 443. Furthermore, Schultz encouraged Plaintiff to take FMLA leave if she needed it, (Def.'s SOF ¶ 165), further undercutting the possibility that Plaintiff could establish Defendant's retaliatory intent. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). Because Defendant has shown that "there is no genuine dispute as to any material fact" as to Plaintiff's inability to make out a *prima facie* case of discrimination, Fed. R. Civ. P. 56(a), summary judgment must be granted for Defendant on Plaintiff's FMLA retaliation claim.

Plaintiff's FMLA interference claim likewise fails because the record contains no suggestion that any employee at Defendant interfered with Plaintiff's attempt to take FMLA leave.

The FMLA does not "necessarily guarantee[] that plaintiffs have an automatic right to claim interference where . . . the claim is so clearly redundant to the retaliation claim." *Lichtenstein*, 691 F.3d at 312. At her deposition, Plaintiff could not "say definitively who" interfered with her FMLA rights but that Defendant generally did so. (Def.'s SOF ¶ 177.) Absent a specific allegation of who interfered with her FMLA rights, Plaintiff's interference claim cannot survive summary judgment.

Therefore, Defendant's Motion for Summary Judgment on Plaintiff's FMLA claims is granted as well.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**, and judgment for Defendant on all Counts of Plaintiff's Complaint will be entered. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: May 13, 2024